# KELTON BROOKS HUMPHREYS v. RUBY PANKEY HUMPHREYS.—281 S. W. (2d) 270.

Western Division at Jackson. July 13, 1954.

Petition for Certiorari denied by Supreme Court, December 17, 1954.

100

Rhodes & Montgomery, of Paris, and Moss & Benton, of Jackson, for appellant.

Avery Blakeney, of Memphis, and Hugh K. McClean, and Aaron Brown, both of Paris, for appellee.

BEJACH, J. This is a contested divorce suit. The original petition for divorce in this case was filed in October, 1952, in the Circuit Court of Henry County by Dr. Kelton Brooks Humphreys against his wife Mrs. Ruby Pankey Humphreys, seeking an absolute divorce on the ground of cruel and inhuman treatment and willful desertion, and also, seeking custody of the minor daughter of the parties, Rita Humphreys, then aged fifteen years. An answer and cross-bill was filed by the defendant denying the substantive allegations of the original petition and asserting grounds which is alleged to include abandonment and failure to provide, and alleging, also, cruel and inhuman treatment, and praying for a decree of separate maintenance or divorce from bed and board and for custody of the minor daughter. An attachment was issued on the cross-bill on all of the property of the original petitioner, pending the outcome of the case.

In view of the fact that there was both an original bill and a cross-bill in this case, for convenience, the parties will be styled simply as the original complainant or petitioner and defendant, as the case may be, or by their names,—referring to the complainant as Dr. Humphreys and the defendant as Mrs. Humphreys. There were several continuances granted on account of the health of Mrs.

Humphreys. The case was finally brought to trial in July, 1953. At or about the time of the trial, the defendant amended her cross-bill to pray for an absolute divorce, and added an additional ground that petitioner had offered such indignities to her person as to render her condition intolerable and thereby forced her to withdraw. She also amended so as to pray that the title to real estate held by the parties as tenants by the entireties be divested out of the complainant and be vested in defendant, and prayed for solicitor's fees.

As is conceded by the brief of appellant, the charges made in both the original bill and in the cross-bill were amply serious to warrant the granting of a divorce in favor of whichever might be adjudged to have proved their respective allegations.

The proof is quite lengthy, covering more than 250 pages of the record in this case, the complainant having introduced some twenty-five witnesses for proof in chief and four witnesses in rebuttal, while the defendant introduced twelve witnesses. The testimony of the various witnesses will be hereinafter summarized, and therefore, will not be stated at this part of this opinion.

At the hearing of the case, at the conclusion of the complainant's proof, the defendant made a motion for a dismissal. This motion was denied by the Court so far as the petition charged cruel and inhuman treatment, but was granted so far as the case pertained to the allegation of desertion. More will be said about this motion, which, in the opinion of this Court was entirely improper. The defendant was then allowed to amend her cross-bill so as to allege that the making of charges by the petitioner of immoral conduct, considered by the defendant unproved, constituted cruel and inhuman treatment, and defend-

ant's solicitor moved the Court for the granting of a divorce in favor of the defendant and cross complainant at that stage of the case, but this motion was also overruled. The petitioner thereupon amended his answer so as to deny that he had made unfounded charges.

At the conclusion of all the proof, including the rebuttal testimony of the complainant and his witnesses, the Court decreed as follows:

(1) That petitioner, Dr. Kelton Brooks Humphreys, had failed to make out his case and had failed to substantiate his charges, and his Petition was disallowed and dismissed.

(2) That the allegations of the cross-bill are true, and that petitioner was guilty of such cruel and inhuman treatment towards defendant as renders her cohabitation with him unsafe and improper, as charged.

(3) That the defendant is a suitable person to have the control and custody of the minor daughter of the parties, Rita Humphreys, aged 16.

(4) That the defendant is entitled to alimony for herself, maintenance and support for said child and certain property, as well as income from the petitioner.

(5) That solicitors of record for defendant are entitled to attorney's fees of $2,000.

(6) That the bonds of matrimony between the parties be absolutely and perpetually dissolved, restoring to the defendant and cross complainant all the rights of an unmarried person.

(7) That the defendant and cross complainant be awarded the real estate known as 1104 Eastwood Street, Paris, Tenn., previously owned as tenants by the entireties and where the parties made their home, together with all fixtures, household furnishings and personal effects

located therein and used as part of same, and that title to same be divested out of petitioner; and further that petitioner pay to defendant, the sum of $3,000 as alimony, and the further sum of $200 per month for the maintenance and support of defendant and the minor child, beginning Sept. 1, 1953.

The attachment was continued to the extent of $5,000, presumably to protect the lump sum payment of $3,000 allowed as alimony to Mrs. Humphreys and $2,000 for her attorneys. The cause was retained in court. The petitioner's appeal was allowed to the next term of the Court of Appeals, upon the execution of a cost bond, only.

The petitioner, Dr. Kelton Brooks Humphreys, testified that he was aged 47; that Mrs. Humphreys was aged 45; that they were married at Marion, Arkansas, May 25, 1928 and have two children, Kelton Brooks Humphreys, Jr., aged 23 and Rita Humphreys, at that time, nearly 16 years of age. He said their marriage had been happy until 1934 when it began to deteriorate, Mrs. Humphreys always picking at something and that nothing suited her. He said that Mrs. Humphreys interfered in his practice, would call him up and demand that he return home, but that when he got there, she did not want anything. He said she would have ''spells'' and call a doctor. She would go to bed and stay indefinite periods, on one occasion, having stayed in bed more than a year, although the doctor could find nothing organically wrong with her. He said he provided domestic help, but Mrs. Humphreys could not get along with any of them; that he had finally let her do the hiring and she has subsequently done most of the work herself. He said they had twenty servants that stayed not more than two or three days each. After

the birth of their second child, Mrs. Humphreys had needed surgery to repair lacerations and that she had had herself sterilized at that time without previous notice to him. He testified that on one occasion, Mrs. Humphreys locked him out, and that when he went to a hotel he stayed four or five days. He said that he returned when she telephoned and said that she was sorry. He said he went home to lunch, but would find that she had not begun preparing the lunch until after he arrived. He finally quit going home to lunch and ate his meals downtown. He testified that Mrs. Humphreys constantly accused him of interest in other women and that such accusations were without foundation. He said that Mrs. Humphreys manifested considerable interest in the opposite sex. He said that in April, 1952, he went by home to get his son. When he went by his bedroom, Mrs. Humphreys was coming away from the window, completely nude. He said that in the summer of 1950, he started to Kentucky Lake with Mr. and Mrs. Brandon, their two children, his own daughter, Rita, and two other friends of Rita; that Rita forgot her bathing cap and they drove by home to get it, on which occasion, Mrs. Humphreys followed them in their son's car and raised a big row at the Lake and interfered with their fishing. He said he took the Brandons into a boat, and asked Rita to try to get Mrs. Humphreys to return home, which she did.

He stated that he left Mrs. Humphreys on October 25, 1952. He went first to his father's home, where he stayed until Christmas, and that now he is residing at Mrs. Hester's.

He testified, further, that Mrs. Humphreys left their marital bed in 1946 and had not returned since, although he advised her that she was welcome to return.

He testified, further, that in 1939 he and Mrs. Humphreys drove with his father and mother to the World's Fair at San Francisco and that she raised such a disturbance with his parents that they were on the point of leaving and coming back by train.

He said that in 1942, two painters were working at one window while painting his home. He said this excited his curiosity and he went back and looked. He found that Mrs. Humphreys had nothing on but a bathrobe which she had opened before the men.

Dr. Humphreys testified that about five years ago, Mrs. Humphreys had ordered his parents not to come back to his home anymore. He said that Mrs. Humphreys had refused to go to his mother's funeral and would not permit Rita to go.

Dr. Humphreys testified that since this suit had been filed, Mrs. Humphreys came to his office and threw his Masonic Bible and apron into his reception room, to his great embarrassment, there being some five or six patients there at that time.

Dr. Humphreys said that at the beginning of their married life, they had charge accounts which Mrs. Humphreys used freely, and that he gave her money when she asked for it, that she did not like this arrangement because she didn't want to ask for money. Thereupon he opened a joint checking account which she didn't like because she objected to his knowing to whom she wrote checks. He said that she refused to keep the check stubs and got angry when she found that he got statements from the bank. After that they arranged for separate accounts at different banks.

He commented about the issuance of an attachment on all of his property on the filing of her cross-bill, although no ground for attachment was alleged.

Dr. Humphreys testified that in 1943, while at the breakfast table, she saw a neighbor putting the limb of a tree in a gulley on their property and that in spite of his telling her that he had given permission she went out and raised such a row with the neighbor that he took the limb away.

Dr. Humphreys testified, further, that at the time they sold part of their property to Mr. and Mrs. Trone, they agreed that the Trones might use their property for access, temporarily, until they had arranged for a driveway on their own property, but that in spite of this being part of the bargain, Mrs. Humphreys stopped Mrs. Trone from crossing their land.

Dr. Humphreys testified that at the time he married Mrs. Humphreys, he was still in dental school and that she was employed as a checker in a grocery store, earning $15 per week which she contributed to their joint support. He said that at the time of his graduation, he owed $2,200.

Dr. Humphreys testified that Mrs. Humphreys made skirts out of his suits, sometimes taking a suit that he was still using.

Dr. Humphreys testified that since the institution of this suit, he had been sending Mrs. Humphries $50 every two weeks and in addition, paying all bills. He indicated an intention to make some settlement on Mrs. Humphreys if he were successful in this suit.

Dr. Humphreys testified about an incident when he and Mrs. Humphreys went to Memphis by car, taking with them his office assistant, at that time, whose name was Sara Tayloe, and that Mrs. Humphreys stayed in Memphis, but that Sara Tayloe came back to Paris with him on the same day. This incident is referred to in Mrs. Humphreys' testimony.

Being asked about Mrs. Humphreys' treatment at Gailor Psychiatric Hospital in Memphis, he said that had occurred since this suit started.

Mr. William K. Porter was introduced as a character witness for Dr. Humphreys.

Mrs. Ruth Arnett, sister of Dr. Humphreys, testified that she had formerly been his office assistant, and said that Mrs. Humphreys was constantly asking her who was in the chair. She said that Mrs. Humphreys called her a liar many times when she made reports to her in response to such requests. She said that it had been seven years since she had been assistant to Dr. Humphreys. She said that she took care of Rita while Dr. Humphreys and Mrs. Humphreys and Dr. Humphreys' parents went to San Francisco. She said that Mrs. Humphreys refused to go to the funeral of Dr. Humphreys' mother and would not let the children go.

Mr. J. T. Humphreys, father of Dr. Humphreys, testified about the trip which he and his wife made with Dr. and Mrs. Ruby Humphreys to San Francisco. He told of the incident when Mrs. Ruby Humphreys raised such a row with Mrs. Humphreys, Sr., that he and his wife had been on the point of leavng and returning by train, but that Mrs. Ruby Humphreys begged them not to, and they reconsidered. He testified as to the incident when Dr. Humphreys was locked out and said he heard Mrs. Humphreys threaten to burn up her children.

Mrs. Trone testified that in 1950, Mrs. Humphreys told her, Mrs. Trone, that she (Mrs. Trone) was having an affair with Dr. Humphreys. She said that this statement was made across the hedge between their homes.

Mrs. Ernestine Elam said that Mrs. Humphreys honked her horn at her and stuck out her tongue, that later Mrs.

Humphreys called her repeatedly, and although she never accused the witness of having an affair with Dr. Humphreys, she made faces at her every time she saw her, and that on one occasion, hit her with a rolled up church bulletin. She said that she reported this situation to Dr. Humphreys at the office of Dr. Horace.

Mr. Ira Scott, Sr., testified that in April, 1952, he was going to the Lake with Dr. Humphreys, who owned property immediately adjoining his at the Lake, that he drove up to Dr. Humphreys' home and that Mrs. Humphreys came to the window nude. He identified a statement presented to him, that he had given to Mr. Neece. In this statement he said that his attention was attracted by the raising of a venetian blind, that he had looked twice, and that the second time, Mrs. Humphreys came back and stood in the window.

Mr. J. C. Arnold, a painter, testified that he had helped paint Dr. Humphreys' home in 1942, that Mrs. Humphreys exposed herself by having on only a bathrobe which she opened down the front.

Miss Grace Puckett testified about a conversation which she had with Mrs. Humphreys at the First Baptist Church. She said Mrs. Humphreys said, talking about Dr. Jelks, athletic coach at the High School, "Did you see the look in his eyes when he looked at me?"

Mr. John Frank Thompson testified as to an incident which occurred while he was talking to Franklin Simmons. He said that Mrs. Humphreys came by, that he, himself, said nothing, that Mr. Simmons tipped his hat and said, "How do you do, Mrs. Humphreys?",—that Mrs. Humphreys went on by and did not speak to either of them.

Mr. Herman Reynolds appraised the value of Dr. Humphreys' home at $16,000.

Mr. J. P. Lasater, Jr. was a character witness.

Mrs. Edith Thompson, wife of John Frank Thompson, testified that she remembered the incident when her husband was giving Masonic instruction to Franklin Simmons, and said that Mrs. Humphreys asked her who the men were, referring to her husband and Franklin Simmons, and that Mrs. Humphreys said that she thought they had spoken to her in a manner which they shouldn't.

Mr. P. L. Sykes testified that he borrowed Dr. Humphreys' hunting dog on one occasion, but that when he went to get the dog, Mrs. Humphreys made him bring the dog back.

Dr. M. P. Bomar testified that he went to the home of Dr. Humphreys to inoculate the dog of Dr. Humphreys' little girl, on which occasion, Mrs. Humphreys slammed the door in his face, but pitched the dog out to him, and that after he had inoculated the dog, Mrs. Humphreys again slammed the door in his face.

Mrs. Margaret Martin testified that Mrs. Humphreys called her and said that her husband, Mrs. Martin's, was head of the Masonic Lodge and that Mrs. Humphreys wanted to know if the Masons could do anything about a man who couldn't behave himself.

Tillman Brisendine testified by deposition. He said that he went with his wife to the home of Dr. Humphreys for Masonic instructions, that the first visit was pleasant, but that on a second visit, it was very unpleasant, that Mrs. Humphreys was rude to him, to his wife and to Dr. Humphreys.

Mr. P. H. Lewis, a carpenter, testified that in 1938 he did some work for Dr. Humphreys, built a volleyball board and a grape arbor, that Mrs. Humphreys ordered him to change the location of the grape arbor, but that

when Dr. Humphreys came home, he had it changed back to the place first designated.

Mrs. Nancy Brisendine, wife of Tillman Brisendine, testified about a visit which she made with her husband to the home of Dr. Humphreys, while he was receiving Masonic instruction from Dr. Humphreys. She remembered but one visit, however, and no unpleasant incidents. She said, however, that when Mrs. Humphreys had telephoned her, she had apologized about an incident in connection with a dog. She said Mrs. Humphreys said she was sorry and it would not happen again because she couldn't have people talking about her.

T. N. Brandon, Jr., testified by deposition. He said that he is an airplane pilot, living in Memphis, Tennessee, but formerly lived in Henry County, from 1947 to March 1952. He said that he was a friend and patient of Dr. Humphreys. He testified about an occurrence that happened in May or June of 1950 on the occasion of a fishing trip to Kentucky Lake. His exact language was:

"A. The Doctor came by our house and picked us up, and my wife and child and I got in the front seat. Rita, his daughter, Amy Martin and some other child, a friend of Rita's, were also in the car. Rita forgot her bathing cap and we went by the Humphreys' home to get it. Mrs. Humphrey came to the window and just stared at us for a long time, but as we started to drive off, she raised the window and shouted something like, "He has him a girl", and I suppose that remark was directed to Doc.

"Mr. Blakeney: I move that the word 'suppose' be stricken.

"Court: Sustained.

"Q. Go ahead? A. We went on down to the lake,

which was about 20 miles. After we turned on to the gravel road, one of the little girls said, ''Here comes Mrs. Humphreys, she is following us.''

''Mr. Blakeney: I object to that because it is hearsay.

''Court: Sustained.

''A. We went on to the lake and when we got out of the car, she was already out of the car she was in, and was standing with her hands on her hips and said, (interrupted)—

''Q. Don't relate any conversation, just tell us what happened? A. We went on down to the boat house and she got in the boat before we did and was still fussing, and we decided not to go fishing at that time, but we decided to fish off of the platform at the boat dock. My son told her if she didn't act better Doc wouldn't let her ride in the boat, and she replied it was as much her boat as it was his. She continued on the tirade and kept saying there must be some woman back of it, and if she found out who it was, she would kill her. Doc talked to Rita and asked her to get her mother to go on home, and she did. After she left, we got in the boat and went fishing.

''Q. Was anything said about a divorce on that occasion? A. Yes, she told him he could have a divorce anytime he wanted it, and he said he would like to have one now.''

Mrs. Humphreys, he said, called Mrs. Brandon and threatened her, that he talked to the Sheriff. He said that he feared for the safety of his family, and as a result of threats to his wife, he kept a loaded gun and a large stick in the kitchen for protection. He testified that later, when Dr. Humphreys was at his home to play cards, Mrs.

Humphreys phoned; that her message was repeated by Mrs. Brandon to Dr. Humphreys and Mr. Brandon, to their great embarrassment.

Mrs. Jean Brandon, wife of T. N. Brandon, Jr., testified, also by deposition. She corroborated the incident of the fishing trip, also about the conversation at the Lake in which Mrs. Humphreys said that Dr. Humphreys could have a divorce anytime he wanted one and that he said that he wanted one that day. She also testified that Mrs. Humphreys called her and said:

"A. She called one Sunday afternoon when my husband and child and the doctor had gone to the lake fishing. She said she never wanted me or my husband to ever get in his car again or come in her driveway or go to the cabin on the lake. She said she did not intend for her husband to have anything to do with it or with us."

Mrs. Brandon also said:

"A. He and two men friends were playing cards on Sunday night and she called and wanted to know if he was there. I told her he was and she said, "I will kill him and the two of you, too, for allowing him to come over there."

Mrs. Brandon said further:

"A. I would be in the grocery store or on the street and see her and if we were in the grocery store she would pick up a can of canned goods and hold it like she was going to strike me with it and stare at me. I would just stare her down and she would walk on. When I would see her on the street she would spit and go on by."

Mr. R. C. Humphreys who said he was related to Dr. Humphreys distantly if at all, testified by deposition. He

said that Dr. Humphreys had given him permission to put a tree, which had been cut down, in a gulley on Dr. Humphreys' land, that he sent the tree by one Bud McDaniel, but that McDaniel brought back the tree.

Mr. Paul H. Trone testified by deposition. He said that while building his home on the lot which he bought from Dr. Humphreys, he had an agreement for the temporary use across Dr. Humphreys' property as access to his property, but that Mrs. Humphreys stopped him from using it.

Mrs. Ima Hicks testified as to a telephone conversation with Mrs. Humphreys in which she said Mrs. Humphreys protested that other people were meddling in her business. Mrs. Hicks said she hung up.

The proof offered by the defendant and cross complainant, Mrs. Humphreys was as follows:

Mrs. Humphreys, herself, testified that her domestic difficulties began about twenty years ago, at which time she caught Dr. Humphreys kissing Mrs. Reynolds. She said she saw him a few nights later with Mrs. Reynolds in a car on Dunlap Street, together with Claude Toller and Clare Nell Cooper. She said Dr. Humphreys was absent from home at night, but at first, not all night. She said that later, he began to stay out all night, about eight years ago. She said that about eight years ago he told a horrible lie about her and tried to get her to admit that was true. The lie was, that she was a whore before he married her. She said this happened at Mr. Charles Neese's home at the time Roy Acuff was running for Governor.

She said, also, that while the camp was in operation in that vicinity, she rented a room to a Lt.——— and her husband and there seems to have been some question that developed later as to whether this couple was married.

She said that Dr. Humphreys was cool and indifferent to her sister-in-law, Mrs. Thurman Pankey, and also towards her mother. He simply ignored them.

She told of the incident on the trip to California with Dr. Humphreys and his parents and said it was simply a discussion as to who should cook breakfast. She said his parents found fault with her continually.

She said that during the last eight years, Dr. Humphreys had not been taking her out.

She said that Dr. Humphreys did not want the second child, and refused to provide transportation for her to the doctor for check-ups.

She said that on one occasion she went to Memphis to visit her mother, that Dr. Humphreys took Sara Tayloe, his assistant along, and she heard Sara tell him that she would be at the Tennessee Hotel when he was ready to leave.

She said that she went last fall, 1952, to Memphis for treatment at Gailor Psychiatric Hospital and was treated by Dr. Ruilmann, Dr. Taylor and Dr. Hill. She said she was given shock treatments.

Mrs. Humphreys denied having exposed herself at her home to Ira Scott or to anyone else. She said she had never been interested, since marriage, in any man except Dr. Humphreys.

On cross examination, she said there had been no marital relations with Dr. Humphreys for the last six or seven years. On being cross examined about her charge that Dr. Humphreys had the reputation of being a notorious flirt, she was unable to give any foundation for such charge and said that the charge was written while she was out of her head.

She said that Dr. Humphreys knew of and consented to

her sterilization at the time the operation was about to be performed.

Mr. William McCreary, a witness for Mrs. Humphreys fixed a cash value of Dr. Humphreys' insurance policies at $6,934.77.

Mr. Stanley Greer placed a valuation on the home place of Dr. and Mrs. Humphreys of $25,000 and valued the furnishings at $3,000.

Mrs. Rutledge, mother of Mrs. Humphreys, designated in the transcript as Mrs. J. V. Rutledge, but she herself, gave her name as Mrs. C. L. Rutledge, or Mrs. Emma L. Rutledge. She said that she lived in Memphis, but had visited her daughter and that Dr. Humphreys hardly spoke to her daughter while she was there, but that he just passed her like dirt under his feet. She said she had never heard much about Dr. Humphreys' reputation for flirtation and didn't know one thing about his reputation.

Mrs. Sue Brockwell testified that Dr. Humphreys made improper advances toward her in 1935, and that she stopped being his patient on that account. She said that his reputation was in accord with his conduct toward her.

Mrs. T. O. Pankey, sister-in-law of Mrs. Humphreys, testified that she visited in the home of Dr. and Mrs. Humphreys in 1951, staying from Tuesday until Friday. She said that she didn't feel welcome, because Dr. Humphreys was so cold to his wife,—hardly spoke to her.

Mr. Henry McElroy said that he, along with J. C. Arnold, painted Dr. Humphreys' house, along about 10 years ago. He said that he did not see Mrs. Humphreys expose herself.

Mr. Pete Todd, a brick layer and painter, testified that J. C. Arnold got him to talk to Mr. Neese and Dr. Humphreys, which he did, but he denied having seen Mrs.

Humphreys unveil herself, and denied having seen Mrs. Humphreys until the day before he gave his testimony.

Mrs. Ardelle Cole testified that Mrs. Humphreys was a proper person to have the custody of her daughter. She said she lived near the Humphreys until 1942 and has visited in their home since.

Mrs. Howell Owens testified that Mrs. Humphreys is a proper person to have custody of her daughter.

The deposition of Dr. Cyril Ruilmann, a psychiatrist, was read on behalf of Mrs. Humphreys. He said that he examined Mrs. Ruby Humphreys about December, 1952. He said that Mrs Humphreys was in a neurotic condition, but not crazy, nor bordering on insanity. He advised continuance of the case which was set at that time for trial in January, 1953. He called her condition a "reactive depression". He said he thought the divorce case was the probable cause of this depression.

The deposition of Dr. T. S. Hill, also a psychiatrist, was read in behalf of Mrs. Humphreys. Dr. Hill testified that Mrs. Humphreys was admitted to Gailor Psychiatric Hospital on April 8, 1953, and discharged July 7, 1953. He said she was suffering under a condition of psychoneurosis.

In rebuttal, Dr. Humphreys testified denying that he kissed Mrs. Reynolds. He also denied having been in a car with Mrs. Reynolds, Claude Toller and Clare Nell Cooper, now Mrs. Claude Toller. He said that the only time he had ever been anywhere with Mrs. Toller was fishing and that was in the daytime and not at night. He denied having accused his wife, Mrs. Humphreys, of running a whore house or anything like that. He said the trip to Memphis with Sara Louise Tayloe, his assistant, was with the full knowledge of Mrs. Humphreys,

that they went and came back the same day, but that Mrs. Humphreys stayed in Memphis. He denied having intentionally made advances toward Mrs. Brockwell.

Mrs. Clare Nell Toller, formerly Clare Nell Cooper, testified that she had never been in an automobile with Dr. Humphreys in her life, with Mrs. Reynolds or otherwise.

The testimony of Dr. W. H. Jolley, offered in rebuttal, was excluded by the Court.

Dr. K. B. Humphreys, Jr., put on the stand as a witness in rebuttal, produced a letter from his mother, dated July 20, 1953. The general purpose of the letter was to contradict Mrs. Humphreys' testimony that she made no plans for her future. The letter stated to her son, that after the divorce case was over, she planned to study floral designing at the Idlewild Greenhouse in Memphis, Tennessee.

The appellant, Dr. Humphreys, has made six assignments of error, as follows:

## Assignments of Error

(1) The court erred in dismissing the petition of Dr. Kelton Brooks Humphreys, the original petitioner, seeking absolute divorce.

This was error because the preponderance of all the evidence shows that the petitioner Dr. Humphreys was entitled to a divorce from his wife, defendant Ruby Pankey Humphreys, and that she was not entitled to the relief sought by her.

(2) The court erred in granting a divorce or any relief to the defendant, Ruby Pankey Humphreys.

This was error because the preponderance of the evidence shows that because of her own misconduct she was not entitled to the relief sought by her cross-bill.

(3)  The court erred in awarding the care and custody of Rita Humphreys, minor daughter of the parties, to the defendant, Ruby Pankey Humphreys.

This was error because the evidence shows conclusively that she is a person unfit to have the care and custody of a minor child, both by reason of her misconduct, as well as because of her mental instability.

(4)  The court erred in awarding the defendant alimony in solido and monthly payments, or either.

This was error because the proof in this case shows that the petitioner Dr. Humphreys was entitled to the divorce, and the care and custody of the minor child, rather than the defendant, Ruby Pankey Humphreys.

(5)  The court erred in the amount of alimony awarded the defendant, and in the amount of the monthly payments for maintenance and support allowed her in future, the award being grossly excessive.

This was error because the record shows that the amount of alimony in solido is approximately sixty per cent of the petitioner's total property, and also because the court coupled with the award of alimony in solido an allowance of $200 per month out of the earnings of the petitioner indefinitely.  Neither the facts of the case nor the law of Tennessee warrant the court's decree as to alimony.

(6)  The court erred in continuing in force the attachment of petitioner's property to the extent of $5,000.

This was error because absolutely no ground for an attachment of petitioner's property is alleged in the cross-bill, or otherwise, and none is proved.

These assignments of error raise, in the opinion of this Court, two major questions and two minor ones. The two major ones are (1) whether the divorce should have been

granted to Mrs. Humphreys or to Dr. Humphreys, and (2) as to the award of alimony and the amount thereof. The two minor questions presented are as to the custody of the minor child, Rita Humphreys and (2) as to the propriety of having issued an attachment in this case, no ground for attachment having been alleged.

This opinion has undertaken to summarize all of the evidence in this case, both that adduced on behalf of the complainant, petitioner below, and also that of the defendant and cross complainant, Mrs. Humphreys. In the light of all of the testimony in this record, it is difficult for this Court to understand how the trial judge could have arrived at the conclusion that Dr. Humphreys has failed to establish the allegations of his petition for divorce, and that Mrs. Humphreys has established the allegations of her cross-bill.

■ Divorce suits are triable de novo in the Court of Appeals, and the evidence will be considered only for what it is worth. Rush v. Rush, 33 Tenn. App. 496, 502, 232 S. W. (2d) 333.

■ Divorce cases, even though tried in the Circuit Court are treated as Chancery suits. Richmond v. Richmond, 18 Tenn. 343, 344; Hawkins v. Hawkins, 36 Tenn. 105; Browder v. Browder, 188 Tenn. 488, 221 S. W. (2d) 526.

■ Trying this case de novo in the Court of Appeals as a Chancery proceeding, it is the opinion of this Court, that the overwhelming preponderance of the evidence is in favor of the complainant, Dr. Humphreys, and in support of the allegations made in his original bill or petition for divorce, and that conversely it is the cross complainant, Mrs. Ruby Humphreys, who has totally failed to prove the allegations of her cross-bill.

Summarizing, the preponderance of the evidence establishes on behalf of the original complainant, Dr. Humphreys, that the conduct of defendant, Mrs. Ruby Pankey Humphreys, for about twenty years has been such as to entitle the petitioner, Dr. Kelton Brooks Humphreys, to an absolute divorce. She has constantly nagged and harassed him. She has locked him out of their house when he returned from work. She has made many and numerous unwarranted disturbances in front of his friends and patients to his great embarrassment and humiliation. She has falsely accused him of improper conduct and association with other women, and she has exhibited her body to various men in a lewd and improper manner; all to the great embarrassment and humiliation of her husband.

Conversely, even the vague and indefinite charges which are made in the cross-bill, are not proved. The only two incidents which are really relied upon as constituting cruel and inhuman treatment of the original complainant towards the defendant occurred some twenty and seventeen years ago, respectively, even if they occurred at all.

It is therefore the opinion of this Court, that Mrs. Humphreys has been guilty of such cruel and inhuman treatment or conduct towards Dr. Humphreys as makes cohabitation unsafe and improper.

Cruelty warranting a divorce may result from a continuing course of abusive and humiliating treatment of one spouse by another, as in the case of a course of conduct calculated to torture the complaining spouse's mental health or emotional nature and affecting his or her bodily health. Garvey v. Garvey, 29 Tenn. App. 291,

300, 203 S. W. (2d) 912; Meeks v. Meeks, 27 Tenn. App. 279, 179 S. W. (2d) 189.

■ False charges of adultery have repeatedly been held to constitute such cruel and inhuman treatment as to warrant the granting of a divorce. Sharp v. Sharp, 34 Tenn. 496; Shell v. Shell, 34 Tenn. 716; Lyle v. Lyle, 86 Tenn. 372, 6 S. W. 878; McClanahan v. McClanahan, 104 Tenn. 217, 56 S. W. 858; Parks v. Parks, 158 Tenn. 91, 11 S. W. (2d) 680; Beard v. Beard, 158 Tenn. 437, 14 S. W. (2d) 745; Watson v. Watson, 25 Tenn. App. 28, 149 S. W. (2d) 953.

In the opinion of this Court, the old adage that ''What is sauce for the goose is sauce for the gander'' is applicable. We know of no rule or principle that would make a false charge of adultery by a husband against his wife ground for divorce and not make similar false charges of wife against her husband equally available in his behalf.

■ As to the charges made by Mrs. Humphreys against Dr. Humphreys of improper conduct towards the opposite sex, as stated above, these incidents ocurred, if at all, twenty and seventeen years ago, respectively. It is not the idea of this Court that Mrs. Humphreys could overlook such conduct for so long a time and then revive same for the purpose of getting a divorce. While it is true that cruel and inhuman treatment as a ground of divorce can not be condoned in the same sense that adultery as a ground for divorce may be condoned, and thereby in legal contemplation wiped out, nevertheless, there is a principle that cruel and inhuman treatment may be forgiven and cannot thereafter be relied upon as a ground for divorce, except upon some revival or new act which brings back into life the former misconduct previously forgiven. McClanahan v. McClanahan, 104 Tenn. 217, 228,

56 S. W. 858; Garvey v. Garvey, 29 Tenn. App. 291, 203 S. W. (2d) 912.

The record in this case discloses that Mrs. Humphreys was surprised when Dr. Humphreys left home immediately preceding the filing of the present suit for divorce, and even more surprised when a few days later she was served with process on his suit for divorce. In that situation, she certainly cannot be heard to say that misconduct on the part of her husband which occurred seventeen and twenty years previously could be by her immediately revived and made the basis of a ground for divorce against him.

■ This Court being of opinion that the decree of the Circuit Court should be reversed and the divorce granted here to Dr. Humphreys, the original petitioner, and that the cross-bill of Mrs. Ruby Pankey Humphreys should be dismissed, the question of alimony in this case becomes immaterial. Section 8449 of the Code of Tennessee provides that where a divorce is granted in favor of the husband, the wife shall not be entitled to alimony. There remains, however, the question of the home place, the title to which is held by the parties as tenants by the entireties. According to the record in this case, the value of this property is from $22,000 to $25,000. With the granting of the divorce by this Court to Dr. Humphreys, the tenancy by the entireties will be converted into a tenancy in common. Cline v. Cline, 186 Tenn. 509, 212 S. W. (2d) 361; McClung v. McClung, 29 Tenn. App. 580, 198 S. W. (2d) 820; Hopson v. Fowlkes, 92 Tenn. 697, 23 S. W. 55, 23 L. R. A. 865, 36 Am. St. Rep. 120.

■ It is true the bill of complainant prays that the Court declare the rights of the parties in the property held by petitioner and defendant as tenants by the entire-

ties, and it might be contended that under authority of Chapter 90, Pub. Acts of 1953 which amends Code Section 8446, the interest of Mrs. Humphreys might be divested out of her and vested in Dr. Humphreys. This Court has no disposition to grant such relief. It is quite probable that the Act in question, if so applied, would be held unconstitutional. The Supreme Court of Tennessee has held that an estate by the entireties is a vested interest, and that even adultery by a wife does not forfeit such interest in property held by her and her husband as tenants by the entireties. Keicher v. Mysinger, Adm. 184 Tenn. 226, 232, 198 S. W. (2d) 330.

The Act in question is not mandatory, however, and even if same be constitutional, which it is not necessary for this Court to decide, this Court sees no reason for depriving Mrs. Humphreys of her vested interest in the property in question. Inasmuch as the property in question is already before the Court in this cause, and both parties having an interest therein, are also before the Court, it is the opinion of this Court that this cause should be remanded to the Circuit Court of Henry County for disposition of the respective interests of the parties hereto in and to the home place in question. If no other settlement is made of the matter, Circuit Court can order a sale of the property for partition and division as between the tenants in common, which the parties hereto will become upon the entering of the decree in this Court.

The disposition made by this Court of the instant case will not affect, in any way, the $2,000 attorneys' fees allowed by the Circuit Court to the attorneys for the defendant and cross complainant. Attorneys' fees in divorce cases are treated as part of the alimony. Shy v. Shy, 54 Tenn. 125; Winslow v. Winslow, 133 Tenn. 663, 182 S. W. 241, Ann. Cas. 1917A, 245.

The $2,000 attorneys' fees, heretofore allowed, to the attorneys for Mrs. Humphreys may properly be treated as alimony pendente lite.

The custody of the minor daughter of Dr. and Mrs. Humphreys was awarded to Mrs. Humphreys and the $200 per month allowance made as alimony in future covered not only such alimony, but also provision for the support and maintenance of the daughter. In the opinion of this Court, the custody of this daughter, who is now more than sixteen years of age, should be awarded to whichever of the parents she prefers to live with. This Court is of opinion that the trial judge should have asked for and obtained an expression of such preference from the daughter, at the time of the trial of the case in the lower Court. As the record now stands, however, we see no reason for changing the award of custody of the daughter. Since the case is to be remanded for disposition and final settlement of the property interests of the parties hereto in the home place, the title of which was formerly held by them as tenants by the entireties, a simple disposition of the custody matter will therefore be to remand the cause for that purpose, which may also be finally disposed of by the Circuit Court, with the indication here given, that permanent custody should be awarded in accordance with the preference of the daughter. If such preference be in favor of the mother, or if for any other reason the award of custody to the mother heretofore made, be or remain unchanged, the father, Dr. Humphreys, will of course, as a matter of law, remain jointly liable with Mrs. Humphreys for the support and maintenance of their minor daughter. On the remand of this cause, however, if the award is finally and permanently made to Mrs. Humphreys of custody of Rita

Humphreys, the Court may also determine and fix some specific amount to be paid by Dr. Humphreys for child support.

The question as to the attachment in this cause, which is complained of in one of appellant's assignments of error, we think should be decided in favor of the appellant's contention. Appellant's brief cites Sections 9396 and 9416 of the Code of Tennessee as authority for the proposition that to be entitled to an attachment, the party seeking same must allege a legal ground for the attachment. This statement of the law must be supplemented, however, by the observation that Chancery Courts have inherent jurisdiction to grant attachments in proper cases on grounds other than the statutory gounds for attachment which are applicable, both to suits in equity and to actions at law. Gibson's Suits in Chancery, (4th Ed.) Sections 23-25. Such invocation of the inherent jurisdiction of the Chancery Court, must, however, be upon allegations and prayers specifically directed to that end. As pointed out above, divorce cases, even though tried in the Circuit Court, are treated as Chancery Suits. Richmond v. Richmond, 18 Tenn. 343, 344; Hawkins v. Hawkins, 36 Tenn. 105; Browder v. Browder, 188 Tenn. 488, 221 S. W. (2d) 526. In the instant case, no allegation or prayer invoking the inherent jurisdiction of the Court as a court of equity is contained in the crossbill, and no statutory ground for attachment is alleged. Our conclusion, therefore, is that the attachment was improperly issued in the first instance and must now be dissolved.

The conclusion which this Court has reached in this cause, namely, that of reversing the judgment of the Circuit Court, and awarding the divorce decree to

the original complainant, Dr. Humphreys, and in dismissing the cross-bill of Mrs. Humphreys, is fortified by the situation referred to above, in which this opinion criticizes the action of the Circuit judge for entertaining a motion at the end of complainant's proof, made by defendant to dismiss complainant's suit, and then permitting the defendant and cross complainant to offer proof after such motion had been denied. The law applicable to such situations is as follows:

"Dismissing a bill at the close of plaintiff's case, before defendant presents or rests his case, is not correct practice in equity, in the absence of express provisions to the contrary. The case being set down on the bill, answer and proof, if defendant is willing to risk his case on the plaintiff's proof or rather the failure of plaintiff to prove his case, he should submit the case to the Court for final hearing, and if he is not so satisfied, he should present what proof he desires or may be able to present.

"A motion to dismiss at the close of all the evidence is unopportune; the motion should not be made until the Court has made findings of fact." 30 C.J.S., Equity, Sec. 579, page 972; Sundlun v. Volpe, 62 R.I. 55, 2 A. 875; In re Title of Pa Pelekane, 21 Haw. 175; Gordon v. Gordon, 277 Pa. 53, 120 A. 709; Shaten v. Volco Cement Corp., 23 Del.Ch. 101, 2 A. (2d) 152; Pearce v. Tharpe, 118 Miss. 107, 79 So. 69; Federal Land Bank of Springfield, Mass. v. Flanders, 105 Vt. 204, 164 A. 539; Kennedy v. Robinson, 104 Vt. 374, 160 A. 170; Raithel v. Hall, 99 Vt. 65, 130 A. 749; Vol. 20 Tenn. Law Review No. 3 (April, 1948) p. 245.

The trial judge should either have refused to entertain the motion for dismissal made at the end of

complainant's proof, or, having entertained same and overruled it, he should have, thereafter, refused to permit the defendant to offer any proof.

The judgment of the Circuit Court will be reversed. The cross-bill of Mrs. Ruby Pankey Humphreys, except insofar as same prays for the award of custody of Rita Humpheys, minor daughter of Dr. and Mrs. Humphreys, will be dismissed. The original bill of Dr. Kelton Brooks Humphreys will be sustained and an absolute decree of divorce granted in this Court in his favor and against defendant, Mrs. Ruby Pankey Humphreys, on the ground that she has been guilty of such cruel and inhuman treatment or conduct as renders cohabitation unsafe and improper. The attachment heretofore issued in this cause will be dissolved, and this cause will be remanded to the Circuit Court of Henry County for the purpose of making a final award as to the custody of Rita Humphreys, minor daughter of complainant, Dr. Humphreys and Mrs. Humphreys, after obtaining an expression of preference from said daughter, for disposition of the rights of the parties hereto in and to the home place, No. 1104 East Wood Street, Paris, Tennessee, heretofore owned by Dr. and Mrs. Humphreys as tenants by the entireties, and for any other action not inconsistent with this opinion. The costs of the cause below and of this appeal will be paid by appellant, Dr. Kelton Brooks Humphreys, and the surety on his appeal bond.

Avery, P. J. (W. S.), and Carney, J., concur.