J. M. PATTERSON and T. M. ALLEN, Appellants, v.
ANDERSON MOTOR CO., INC., J. R. ANDERSON
and MRS. SHIRLEY G. ANDERSON, Appellees.
—319 S. W. (2d) 492.

Western Section. July 29, 1958.

Certiorari denied by Supreme Court December 12, 1958.

Rehearing on Petition for Certiorari denied by Supreme Court
January 23, 1959.

36

Byrd, Hoffman & Summers, Memphis, for appellants.

Bullock & Bullock, Memphis, for appellees.

BEJACH, J. This cause involves a suit by J. M. Patterson, sometimes referred to as "Pat" Patterson, and T. M. Allen to recover from the Anderson Motor Co., Inc., J. R. Anderson and Mrs. Shirley G. Anderson, $2,000 deposited as earnest money in connection with the execution of a contract designated as "Buy and Sell agreement", which contract was dated May 20, 1957. For

convenience, the parties will be styled, as in the lower court, complainants and defendants, or referred to by their individual names—Patterson and Allen having been complainants in the lower court and Anderson Motor Co., Inc., J. R. Anderson and Mrs. Shirley G. Anderson, defendants. Under the terms of the buy and sell agreement, complainants undertook to buy and defendants to sell the assets of the Anderson Motor Co., Inc. By the wording of this contract, defendants are designated as parties of the first part and complainants as parties of the second part. The purchase price specified was $20,000. The $2,000 involved in this cause was deposited with defendants as earnest money. The buy and sell agreement was introduced in evidence at the trial in the lower court and a photostatic copy of same is incorporated in the record. It will not be necessary to state or copy the provisions of this contract, except those contained in paragraphs 5 and 6 of same, which are as follows:

"5. This buy and sell agreement is conditioned on the parties of the second part getting a franchise for the sale of the Mercury Automobiles from the Ford Motor Company, and, further conditioned upon the approval of the Ford Motor Company of the sale of T. M. Allen of his interest in the partnership known as Allen Ford Sales Company, at Olive Branch, Miss. to his partner, W. H. Allen.

"6. The parties of the second part have herewith deposited with the parties of the first part, Two Thousand ($2,000.00) Dollars, earnest money to secure the performance of this agreement, and if parties of the second part fail, for any reason other than those excepted conditions listed in the next

paragraph above, the said earnest money shall be forfeited. If this agreement is carried out, as agreed, the $2,000.00 earnest money will be applied to the payment of the original consideration stipulated herein.''

Complainants, in their bill filed July 15, 1957, alleged insolvency of defendants and prayed for an injunction to prevent defendants from disposing of their assets. The injunction was granted, but it was dissolved upon the execution of an ''Indemnity Bond'' in the sum of $2,000 with Massachusetts Bonding and Insurance Company as surety, filed in this cause July 17, 1957. Said bond was by order of court entered February 12, 1958, continued in full force and effect pending the appeal of this cause.

■ This cause was tried by the Chancellor on oral evidence, although we find in the record no stipulation for trial in that manner, nor any order of court directing that it be so tried. It results that this cause must be treated and considered as having been irregularly tried in the Chancery Court. Inasmuch as this cause is before us, however, under the provisions of Section 27-303 T. C. A. which carries forward Section 10,622 of the 1950 Supplement to the Code of Tennessee, enacted in 1951, we think this is immaterial. In our opinion, the cases of Beatty v. Scheneck, 127 Tenn. 63, 152 S. W. 1033; Trice v. McGill, 158 Tenn. 394, 13 S. W. (2d) 49; and Rose v. Brown, 176 Tenn. 429, 143 S. W. (2d) 303, are no longer applicable in this situation, all of those cases having been decided prior to 1950. It results, therefore, that we must dispose of this cause as if same had been tried, in all respects, according to the forms of Chancery.

 The record of this cause reflects another anomalous and rather unusual situation. At the conclusion of complainants' proof, the Chancellor, on his own motion, dismissed complainants' suit, although before so doing, he offered to defendants the opportunity of presenting proof. Defendants, however, declined this offer and elected to offer no proof. In that situation, we hold that defendants must be treated as if they themselves had made the motion for dismissal on complainants' proof, and thus deprived themselves of the right to offer evidence. See Humphreys v. Humphreys, 39 Tenn. App. 99, 127-128, 281 S. W. (2d) 270, 283-284; and Dyersburg Production Credit Ass'n v. McGuire, 40 Tenn. App. 99, 289 S. W. (2d) 540, 541. It results that the decree to be rendered by this Court may be entered in this cause without the necessity of a remand. Also, because of this situation, we think the evidence adduced by complainants must be construed most strongly in their favor.

As appellants, complainants have filed in this court eleven assignments of error. We will not copy these assignments into this opinion, nor discuss them separately. The cause is before us on a broad appeal and the assignments of error, viewed as a whole, properly present the issue of whether or not the Chancellor erred in dismissing complainants' bill.

The evidence before us, all of which was preserved in a bill of exceptions, consists of the testimony of both complainants and that of B. G. Grant, an officer of the Universal C. I. T. Credit Corporation. Mr. Grant, who styled himself a ''non-profit broker'', appeared as a witness in response to subpoenas issued by both complainants and defendants, and testified somewhat reluctantly. We think he must be considered as being, in all respects,

a disinterested witness. His corporation, through him, had been having business relations with both complainants and defendants.

The testimony of complainants and that of Mr. Grant established, we think, the facts of the case, which were, as follows:

In connection with his business as an official of the Universal C. I. T. Credit Corporation, Mr. B. G. Grant ascertained that Mr. and Mrs. Anderson desired to sell the Anderson Motor Company, Inc., and in his capacity as a ''non-profit broker'' he undertook to interest J. M. Patterson in buying same. Mr. Patterson was financially able to handle the transaction, but he was at that time operating two used-car lots in the City of Memphis which consumed all of his time. Nevertheless, he was interested in the proposition and was willing, if he could get T. M. Allen of Olive Branch, Mississippi to go in with him, Allen to put up half of the money necessary to swing the deal, and to put in all of his time operating the company after it had been purchased. The plan contemplated the obtaining of a Mercury agency; and, on the basis suggested by Patterson, Allen was also interested in the proposition, provided he could sell his half interest in the Allen Ford Sales Company of Olive Branch, Mississippi to his partner, W. H. Allen. Such sale by T. M. Allen was also necessary for the purpose of enabling him to obtain money to finance his part of the deal. W. H. Allen, in turn, was interested in buying out the interest of T. M. Allen in the Allen Ford Sales Company of Olive Branch, Mississippi, and they had agreed upon the terms of sale, but that deal fell through because W. H. Allen was unable to raise the funds necessary for consummation of the transaction. In the meantime, informal dis-

cussion was had with Mr. Musselman, who was head of the Memphis office of the Mercury Division of Ford Motor Company, and he was willing to recommend complainants for the granting to them of a Mercury agency in Memphis. Because of the failure of T. M. Allen to complete the sale of his interest in the Ford agency in Olive Branch, Mississippi, however, no formal application for the Mercury agency was made; and, of course, no application was made to the Ford Motor Company for approval of a sale by T. M. Allen of his partnership business to W. H. Allen, because there was no such sale to be approved.

While the negotiations were pending, Mr. Grant was in constant touch with both complainants and defendants; and, according to his testimony, he was making frequent, if not daily, progress reports to each of the parties.

After several conferences between the complainants and defendants, and after the negotiations had reached the stage to which they had developed on May 20, 1957, complainants and Mr. and Mrs. Anderson, together with Mr. Grant, went to the office of Mr. Bullock, attorney for the defendants, for the purpose of having him draw up a contract to evidence the transaction. The contract drawn up by him at that time, is the "Buy and Sell agreement" referred to above, dated May 20, 1957. In the drafting of this contract, which was dictated by Mr. Bullock in the presence of the parties thereto and Mr. Grant, they were interrogated from time to time for the purpose of ascertaining whether the language which was being dictated correctly reflected what the parties desired to have embodied in the contract. As a result of such interrogation, Mr. T. M. Allen spoke up and said, "This

whole thing is hinged on my partner buying my interest in our dealership in Olive Branch because if he can't buy it or can't get the money to buy it, I can't go.'' The language in the contract, ''This buy and sell agreement is conditioned on the parties of the second part getting a franchise for the sale of the Mercury Automobile from the Ford Motor Company,'' had already been dictated, and as a result of Mr. Allen's observation, Mr. Bullock dictated the additional language ''and, further conditioned upon the approval of the Ford Motor Company of the sale of T. M. Allen, of his interest in his partnership, known as Allen Ford Sales Company, at Olive Branch, Mississippi, to his partner, W. H. Allen.'' Before the contract was signed, the parties were asked as to whether or not it contained all that they wished to have embodied in same. Believing that it did, they signed it.

Much of the testimony adduced by complainants was objected to by counsel for the defendants, on the ground that it violated the parole evidence rule and because all preliminary negotiations had been merged into the contract of May 20, 1957. Although the Chancellor dismissed complainants' bill, he treated the evidence as competent. In his oral opinion, delivered at the time of dismissing complainants' bill, the Chancellor said:

''It is the law of this State that in a case of this kind the complainants must establish their case by a preponderance of the testimony. There is a well established rule that parole evidence, that is, evidence by word of mouth, cannot be used to vary or contradict the terms of a written contract; that is, if that parole evidence antecedes the actual making of the contract.

"There is a great doubt in the Court's mind whether all of this testimony with respect to conditions other than those expressed in the contract do not violate that rule known as the parole evidence rule. However, in attempting to consider this matter, the Court has considered it as though there were no such thing as a parole evidence rule, and whether the aggregate testimony, disregarding the parole evidence rule, is sufficient to carry the burden of proof which the law casts upon the complainants."

 We think the learned Chancellor was right when he considered the parole evidence adduced in this cause, assuming, for the purposes of his decision, that it did not violate the parole evidence rule, but wrong in the conclusion which he reached after considering such testimony. As was said by Mr. Justice Chambliss, later Chief Justice, speaking for the Supreme Court in Litterer v. Wright, 151 Tenn. 210, 268 S. W. 624:

"The fundamental distinction should be kept clearly in mind between the denied right to contradict the terms of the writing, and the recognized right without so doing to resist recovery thereon, or to rely upon matters unexpressed therein. The ultimate test is that of contradiction, which is never permissible."

In Brady v. Isler, 77 Tenn. 356, 357, which was a suit on a written contract to buy a stock of goods, the Supreme Court said:

"Defendants were examined as witnesses on the trial and testified that at the time of the execution of the contract, it was agreed that it was not to be operative unless R. M. Isler's mother would consent

to his entering into the arrangement and would become his surety for his part of the purchase money. Said R. M. being a minor. Said H. B., required that he be thus indemnified. This testimony was objected to on the ground that it varied the terms of the written contract. It was admitted, however, by the Court. It is well settled that proof by parole cannot be heard at law, to vary, enlarge or diminish the stipulations of a written contract, yet it may be heard to show whether such contract was in fact made, or whether only upon certain contingencies, it was to take effect.''

In Perkins Oil Company v. Eberhart, 107 Tenn. 409, 64 S. W. 760, 762, McAllister, J., speaking for the Supreme Court, said:

''It is insisted by counsel for appellant that the interpretation of the contract is a matter of law for the court, and we cannot look beyond its four corners for light. It is a cardinal rule of construction that all instruments are to be expounded, and to have effect given them, according to the manifest intention of the parties, as apparent from the whole instrument or agreement, if not incompatible with established principles of law or policy. Polk v. Buchanan, 5 Sneed [721], 726. Again it was said by the Court in Barker v. Freeland, 91 Tenn. [112], 116, 18 S. W. [60], 61: 'It is an indisputable proposition that when a contract is in writing and its meaning is plain and unambiguous, its interpretation is a matter of law for the court.' But when the writing is not plain, and unambiguous, parole evidence is admissible to ascertain the situation and surrounding circumstances, the nature and quality of the subject-

matter, etc. The sole object of the rules and principles laid down for the exposition of contracts is to do justice to the parties by enforcing a performance of their agreement according to the sense in which they mutually understood it at the time. Mills v. Farris, 12 Heisk. [451], 457. In ascertaining the intention, the situation of the parties, the motives that led to the agreement, and the objects designed to be effected by it may all be looked to by the court. * * * Nunnelly v. Warner Iron Co., 94 Tenn. 282, 29 S. W. 124. It is also true, as contended by appellants' counsel, that, in cases of doubt, the instrument will be construed most strongly against the person who actually drew up the paper, or in whose behalf it was drawn."

In the instant case, the Chancellor was of opinion that the contract here involved was plain, clear and unambiguous; and that the failure of complainants to apply for a Mercury franchise entitled defendants to the same rights under the contract that would have flowed from a successful application. With reference to the condition which made the contract depend upon obtaining approval of the Ford Motor Company of the sale by T. M. Allen of his interest in his Ford agency at Olive Branch, Mississippi, his reasoning was that the failure to consummate such sale entitled defendants to the same result. With reference to these matters, the Chancellor said:

"Now, what the complainants would have the Court do is to read a further condition into paragraph 5 of this contract, that before the condition with respect to the approval of the Ford Motor Company must be met; that the sale between T. M. Allen and W. H. Allen must actually have taken

place or must be so binding that it necessarily would take place. That condition, however, is not written into the contract.

"Now, in all negotiations leading to any final agreement, whether it be written or whether it be oral, there are generally various negotiations between the parties, generally conditions annexed by one side and the other side, which are finally merged into a final agreement. Either party or both parties may annex to any contract which they execute or enter into any lawful condition which they desire to impose upon the other. However, the Courts must deal with contracts as finally made and into which negotiations are merged, whether that contract be in writing or whether that contract be in parole. In this case, the contract is in writing.

"The Court considers that the paragraph 5 is plain and clear and unambiguous and the converse of it, as written, is that if the Ford Motor Company does not approve the sale of the two Allens among themselves, then this contract shall be void. In this particular transaction we never get to that point because what the parties had contemplated among themselves would unquestionably take place did not take place.

"Of course, of the two conditions expressed in the contract, that is, one condition being that the party of the second part secure a franchise for the sale of the Mercury Automobile from the Ford Motor Company, that never took place for the reason that no application was ever made for it.

"Of course, the parties can't take advantage of their own failure to even apply for that which is a condition in the contract because the fulfillment of that condition is not on the parties but rests upon the Ford Motor Company.

"The second condition, that the Ford Motor Company approve the sale from T. M. Allen of his interest in the Allen Ford Sales Company to his partner, W. H. Allen, that was never presented to the Ford Motor Company because it was never made.

"Now, it is quite apparent to the Court that these negotiations which culminated in Mr. Bullock's office were based upon a premise which proved apparently to be false, but based upon a premise that there was a valid subsisting and enforceable contract between the two Allens. Mr. Patterson so testifies. He says that in Mr. Bullock's office he understood that Mr. T. M. Allen's partner has agreed to buy him out. He testified that when the agreement in Mr. Bullock's office was written that he understood there was an agreement between the parties. Undoubtedly his understanding that there was a valid, subsisting and enforceable agreement occasions the absence of a request to Mr. Bullock to insert any such further condition in this contract. At least, that is the only conclusion that the Court can draw from a failure to insist that such a condition be written into the contract.

"If we go a little bit further in this matter we come to the testimony of Mr. Grant, who is introduced by the complainants and who appears to be an impartial witness in this case, and his testimony,

and his exact words, I believe—if not exactly, the words I will use will differ very little from him—are these: 'When the contract was being dictated and after several questions by Mr. Bullock and when Mr. Bullock was about to complete the contract, Mr. Allen spoke up and said, 'Wait a moment', or 'Wait a minute. If the Ford Motor Company doesn't go along with the sale to his partner, he couldn't go along.'

''Now, that is the condition which Mr. Grant says was to be written in the contract and that is the condition as the Court sees it that was written in the contract.''

We cannot agree with the reasoning of the learned Chancellor. In our opinion, the condition which required the approval of the Ford Motor Company to the sale by T. M. Allen to his partner included, by necessary implication, the further condition that there must be such a sale before it could be submitted for approval. If there be any doubt or ambiguity as to that, certainly parole testimony was properly introduced for the purpose of making it clear. Also, any doubt or ambiguity must be resolved against defendants, because their lawyer drafted the contract.

Furthermore, we cannot agree with the reasoning of the learned Chancellor which makes the failure of the defendants to apply for a Mercury franchise have the same effect and give to the defendants the same rights they would have had if complainants had applied for and had been granted such franchise. Such conclusion might properly have been drawn, if the failure to make application had been because of bad faith on the part of com-

plainants. In our opinion, however, when complainants were acting in good faith and failed to make application, because, on account of the failure of T. M. Allen to sell his Olive Branch business, their own arrangement for operating the contemplated Mercury agency could not be consummated, no such result should follow. The good faith of complainants and their good and sufficient reason for not applying for the Mercury franchise are abundantly established by the proof in this cause.

Our reasoning is sustained by the case of Lyons v. Stills, 97 Tenn. 514, 37 S. W. 280. In that case, plaintiff had sold to defendant a Texas pony and had taken his note in the sum of $65. The pony died, probably as a result of having her breath cut off by a slip halter which plaintiff had placed on the pony before delivering her. When defendant was sued on the note, he defended on the ground that he had taken the pony on probation for six months, and by the terms of the contract, he had a right at any time that he was dissatisfied, to rescind the trade and deliver up the pony. Defendant was permitted to testify as to the collateral agreement, and, in spite of the fact that he had made no effort to return the dead pony, his defense was sustained by both the Circuit Court and the Supreme Court. Another defense was that there was a failure of consideration. In affirming the Circuit Court, the Supreme Court, speaking through Wilkes, J., said:

"The circuit judge, trying the case without a jury, took this latter view of the case, and, under the evidence, we think he was clearly correct as to the fact of these being a total failure of the consideration. The trial judge was of the opinion it would relieve the defendant from the payment of the note.

The evidence offered by the defendant that he took the pony on probation was objected to, and the circuit judge rejected it. We think the trial judge was in error in discarding this testimony. It does not contradict the note, but sets up an independent agreement, made at the same time, that upon a contingency or condition the note was to become void. This was, competent as between the parties. Bissenger v. Guiteman, 6 Heisk. 277; Hines v. Wilcox, 96 Tenn. 148, 33 S. W. 914, [34 L. R. A. 824]. We think the weight of the proof was that the defendant was to have the right to rescind the trade at any time within six months, if he became displeased with his bargain; and, having exercised his option, we cannot say that he acted arbitrarily in becoming displeased after the pony had put an end to her further usefulness by means of the device furnished by the plaintiff.''

In the instant case, in our opinion, the failure of complainants, in good faith, to apply to the Ford Motor Company for either a Mercury franchise or for approval of a sale from T. M. Allen to W. H. Allen, which was never made, is also substantially analogous to the rule in Corporation Law that before an individual stockholder can prosecute an action for redress of any grievance to the Corporation, he must have applied to the Corporation to bring such suit and have been refused, but, that such demand may be dispensed with as a condition precedent where it would be useless. See Peeler v. Luther, 175 Tenn. 454, 135 S. W. (2d) 926.

More specifically, the instant case seems to be controlled by the recent decision of the Court of Appeals, Eastern Section, in the case of Real Estate Management

v. Giles, 41 Tenn. App. 349, 293 S. W. (2d) 596, 598. In that case, the facts of which are quite similar to those of the instant case, the suit was filed as a bill of interpleader by the Real Estate Management, Inc. against Miss Margaret Giles and C. E. Freeman, the latter of whom had deposited $1,000 earnest money in connection with an offer to buy a certain tract of land from Miss Giles. Freeman had undertaken to purchase three tracts of land, known respectively as the Giles tract, the Dubrow tract, and the Callier tract. He had signed written offers to purchase each of these three tracts and deposited earnest money with each of said offers. Each of these written offers contained a provision that it was contingent upon the buyer's being able to purchase the other two tracts. The offer to purchase the Giles tract was accepted and signed by Miss Giles, but the other two offers were rejected and counter offers made at figures which Freeman was unwilling to pay. The earnest money was returned on the Dubrow and the Callier tracts, but after Miss Giles and Freeman both made demands for the $1,000 earnest money deposited in connection with the offer on the Giles tract, the bill of interpleader was filed. After Miss Giles and Freeman had interpleaded, the Chancellor ruled in favor of Miss Giles, and Freeman appealed. In reversing the Chancellor, the Court of Appeals, Eastern Section, speaking through Howard, J., said:

"Upon the hearing, the Chancellor held, among other things, that the following condition in Freeman's offer—'contingent upon buyer's being able to purchase,' referred to his financial ability; that Freeman was able financially to purchase the Dubrow and Callier tracts at prices which were 'within

the bounds of reason,' and from a decree awarding Miss Giles the $1,000, Freeman has perfected a broad appeal to this Court where, under our procedure, the case is reviewable de novo. Fletcher v. Russell, 27 Tenn. App. 44, 177 S.W. (2d) 854; sec. 27-113 T. C. A.

"After reading the record and giving careful consideration to the three offers made by Freeman, we have concluded that the learned Chancellor not only placed a constrained construction upon the words 'contingent upon buyer's being able to purchase,' but likewise erroneously disregarded the undisputed proof as to what the obvious intention of the parties was at the time the offers to purchase were prepared and signed by Freeman.

"Generally, in construing contracts the Courts not only look to the language of the instrument, but must ascertain, if possible, the intention of the parties, and the construction which is fair and reasonable will prevail. Scott v. McReynolds, 36 Tenn. App. 289, 255 S. W. (2d) 401; Couch v. Couch, 35 Tenn. App. 464, 248 S. W. (2d) 327; Commerce Street Co., Inc., v. Goodyear Tire & Rubber Co., Inc., 31 Tenn. App. 314, 215 S. W. (2d) 4; Nashville Terminal Co. v. Tenn. Cent. Ry. Co., 2 Tenn. App. 646. And where several instruments are made as part of one transaction, they will be read together and each will be construed with reference to the other. Great American Indemnity Co. v. Utility Contractors, Inc., 21 Tenn. App. 463, 111 S. W. (2d) 901; 17 C. J. S. Contracts sec. 298, p. 714.

"Applying the foregoing rules of construction to the offer made to Miss Giles, did Freeman, a successful business man, by using the words 'able to purchase', have reference to his financial ability? Did he intend to unconditionally obligate himself to purchase the Dubrow and Callier tracts at prices he might consider excessive, as insisted on behalf of Miss Giles. Or, on the other hand, is it not reasonably apparent that Freeman, by using the words in question, had reference to his being able to acquire the tracts at prices designated in his offers or at prices acceptable to him. The latter appears to be not only the more logical and reasonable construction, but the undisputed proof shows that such was Freeman's intention prior to and when the offers were signed by him.

"A conditional contract is a contract whose very existence and performance depends upon the happening of some contingency or condition expressly stated therein, and in the instant case Freeman's liability, under the Giles offer, did not attach because the conditions prerequisite to liability were never fulfilled. Mack v. Hugger Bros. Const. Co., 10 Tenn. App. 402; 17 C. J. S. Contracts secs. 338, 456, pp. 792, 937-938; 12 Am. Jur. sec. 328, p. 833."

In the instant case, it is likewise contended that Patterson was financially able to handle the contemplated Mercury agency without the assistance of T. M. Allen, and, consequently, that T. M. Allen's inability to sell his partnership interest in Olive Branch, Mississippi was immaterial. Such, however, was not the intention of the parties, as is amply established by the evidence in this cause. Consequently, we think the intention of the par-

ties, in the instant case, should be carried out and the earnest money restored to complainants.

 There is another and independent reason why the Chancellor's decree in the instant case must be reversed, viz., that under the terms of the contract involved in the instant case, the $2,000 deposited as earnest money was to be forfeited, if for any reason other than the specified exceptions, complainants failed to carry out the contract. In a court of equity, such forfeiture should not be permitted. This reason was not covered in the briefs of either of the parties to this cause, but it was, during the argument of this cause, suggested to counsel by the Court.

Forfeitures or penalties are not favored by our law; but, where a contract is of a nature where damages for its breach are uncertain and not susceptible to exact measurement, it is lawful for the parties to stipulate that a fixed sum shall be recoverable for its breach; and, if the stipulated sum is reasonable under the circumstances, it will be treated as liquidated damages and enforced, although it may be called a penalty or forfeiture in the contract. On the other hand, if a sum so stipulated, is not reasonable, it will be treated as a penalty or forfeiture however named in the contract, and its enforcement refused. Illinois Cent. R. Co. v. Southern Seating & Cabinet Co., 104 Tenn. 568, 58 S. W. 303, 50 L. R. A. 729, 78 Am. St. Rep. 933. Also, in determining whether the amount specified in a bond for performance is a penalty or liquidated damages, the particular words are not conclusive on the parties or the Court. City of Nashville v. Nashville Traction Co., 142 Tenn. 475, 220 S. W. 1087. Applying these principles to the facts of the case at bar, when defendants elected to put on no proof, the matter

was foreclosed against them. Although the contract provides expressly that in the event of default by complainants, other than for the excepted reasons, ''the said earnest money shall be forfeited'', it is at least conceivable that had defendants elected to put on proof, they might have established as a fact that $2,000 was a reasonable sum to be allowed as liquidated damages and thus escaped from this ground for decision of the case against them. In the absence of such proof, however, the Chancellor, in our opinion, had no option other than to treat the $2,000 earnest money, according to the express terms of the contract, as a forfeiture and disallow same. This he did not do, but we can correct his error and disallow it here. It follows, therefore that, independent of the reasons assigned in the earlier part of this opinion, the decree of the Chancellor must be reversed, and the $2,000 earnest money restored to complainants.

The decree of the Chancellor will be reversed and a decree entered in this Court in favor of complainants J. M. Patterson and T. M. Allen, against the Massachusetts Bonding and Insurance Company for $2,000 on the indemnity bond filed in this cause July 17, 1957, and against the defendants, Anderson Motor Company, Inc., J. R. Anderson, and Mrs. Shirley G. Anderson for $2,000, plus 6% interest thereon from July 15, 1957, the date of filing of the original bill in this cause, at the rate of 6% per annum.

The costs of the cause, including those of the lower court, as well as those of this Court, will be adjudged against the defendants.

Avery, P. J. (Western Section), and Carney, J., concur.