WATSON v. WATSON.—149 S. W. (2d) 953.

Middle Section. April 27, 1940.

Rehearing denied, May 25, 1940.

Petition for Certiorari denied by Supreme Court, December 14, 1940.

Further rehearing denied, January 25, 1941.

Joseph Higgins, of Nashville, for appellant.
M. S. Ross, of Nashville, for appellee.

FELTS, J.  This is a suit by a wife for divorce and alimony upon the grounds of cruel and inhuman treatment, indignities to her person, and abandonment.  Code, sec. 8427.  The specific acts charged as constituting such grounds were repeated "imputations upon her chastity" and "quarrels and disputes" in consequence of such accusations. Defendant denied that he had made any such imputations or had done anything to cause complainant to leave their home, and denied that she was entitled to divorce or alimony.

Upon the hearing the chancellor found complainant had failed to sustain her charges and he dismissed the suit at her cost.  She appealed and has assigned some thirteen errors, the first five of which insist that the chancellor should have found that complainant's charges were sustained and should have granted her alimony and an absolute divorce or at least a divorce from bed and board; the next five complain of certain matters which occurred during the hearing; and the last three insist that irrespective of whether complainant was entitled to divorce the chancellor should have adjudged and settled conflicting property rights of the parties and should have taxed defendant with the costs.

Complainant and defendant were married in Carroll County, Tennessee, in October, 1929.  This was defendant's second marriage, he having obtained a divorce from his first wife.  Prior to her marriage to defendant complainant had been a school teacher and postmistress

at Eagle Creek, Tennessee. Defendant was a resident of Davidson County, Tennessee. Soon after their marriage complainant came to Davidson County and the parties lived together as husband and wife in this county continuously until the separation, which occurred February 4, 1939, three days before complainant filed the bill.

Each of the parties is now about fifty years of age. No children have been born of their marriage. At the time of the marriage complainant had no property except a small farm in Benton County, which she still owns. It is not clear what property defendant had at that time; but soon thereafter he purchased two lots in Old Hickory, Davidson County, Tennessee. Upon one of these lots he erected a small dwelling house, which rents for $15 per month. Upon the other lot he built a grocery store with some rooms attached. Complainant and defendant lived in these rooms and he operated the grocery store. He kept a stock of groceries worth about $600 or $700. It seems that both parties were thrifty. They paid their bills in cash and neither of them owed any debts. The money saved from the grocery business was kept in a tin box buried in the basement of the building in which they lived and kept the store. Complainant claims there was about $2,900 of this money; but defendant says in his answer there was about $2,000, and in his deposition there was only about $1,350. By deed dated September 1, 1936, defendant conveyed the two lots to complainant for a recited consideration of $5 and love and affection. As first drawn this deed recited: ''This conveyance is made subject to the life estate therein of the grantor John M. Watson which is expressly reserved.'' This was changed so as to read: ''This conveyance is made subject to the life time home therein of the grantor John M. Watson which is expressly reserved to him.'' This deed was acknowledged September 18, 1936, but was not recorded until June 13, 1938. Defendant also had the privilege license for the grocery store changed to the name of Mrs. J. M. Watson and the business was operated in her name until the license was renewed in February, 1939, shortly after the separation, in defendant's name.

Complainant charges that the deed was made and the license was changed by defendant for the fraudulent purpose of defeating a claim for damages against him resulting from an automobile accident. It does appear that sometime in 1936 he was sued upon such a claim and that he finally defeated the suit sometime in 1938. He, however, insists that he had had some attacks of acute indigestion and did not expect to live long and that he changed the license to the name of complainant to enable her to wind up the grocery business without any cost or trouble in the event of his death; that he made the deed to give complainant the real estate in the event he predeceased her, at the same time having an understanding with her to make a will giving him the property in case she died first; and he exhibited a will which she had executed in September, 1936, giving him all her

property. Complainant also charges that after defendant had executed the deed he caused it to be fraudulently altered by striking out the word "estate" and writing in its place the words "time home" and by adding the words "to him" in the reservation above quoted. But defendant says that this change was made by the draftsman of the deed before defendant signed and acknowledged it. While the draftsman was not called as a witness, the original deed is sent up and the alteration is apparently in the same writing as the body of the instrument.

In the latter part of 1938 or early part of 1939 defendant sought to have complainant convey the real estate back to him. He had a lawyer, Mr. Richard S. West, draw deeds for this purpose. However, complainant declined to sign them. Her refusal caused some trouble between the parties and perhaps precipitated the separation. On February 4, 1939, defendant told complainant he had had the deeds fixed up and that he desired her to go to town with him to sign them. She declined to go. Defendant then went to take her brother-in-law to a hospital in Nashville where the latter's son was a patient; and he states upon his return home he found that complainant had left him and that he was very much surprised at this.

Complainant testified to several conversations between her and defendant when they were alone which are charged to be cruel and inhuman treatment and indignities to her person.

The first of these she said occurred in 1931 with reference to a man by the name of Skelton. After Skelton and his little boy had come to the store, made some purchases, and left, she said defendant asked her: "I want to know what you have ever done that Skelton should have an evil opinion of you." She replied that she did not know he had such an opinion. Then followed a wrangle for some time until she told defendant she was not going to take "such 'cusation'," and thereupon struck him in the face with her fist. He denies that he accused her of any improper relations with Skelton. He said she did strike him with her fist, but this was about another and different matter. She had just come home from the hospital, where she had had an operation for a tumor. Seeing her lifting a kettle of water, he told her not to do that; that Dr. Burch had told her not to lift heavy things; and he added that she would hurt herself and cause him to have to pay another hospital bill. He said that this so offended her that she struck him in the face with her fist; that he said, "Rachel, I would be ashamed of myself;" and that she then began to cry and said she would take the next train back to her former home.

She detailed two conversations with defendant about a milkman named Jones. Jones was at the store and in the presence of the three of them something was said about "smart aleck," to which she replied, "If there is a smart aleck it must be you" (whether she was referring to Jones or defendant is not clear). She said that after Jones

left "John raved about my saying what I did, and cautioned me not to have any thing more to do with Jones, not to talk to him, unless I said something about business." On another occasion Jones was in the store and told complainant he was going to take a Coca-Cola route, and she asked him where it would be. After Jones left "John raved and said do you want to get rid of me, if you do I will go, just let me see you show as much interest in Jones again or anybody else as you showed there and I will be a long time gone." Defendant denied he had ever said anything to her about Jones. He stated he and Jones were friends and had gone hunting together just before Christmas down in Benton County.

Complainant related a conversation between her and defendant about a man by the name of Caruthers, which she said occurred in 1936. The substance of this was that Caruthers had bought a sack full of groceries and then bought a small package of candy, which she dropped into the grocery sack which Caruthers was holding. She said that defendant accused her of slipping cigars to Caruthers and said that she would make Caruthers' wife jealous and "we would lose their trade." Defendant denied this conversation. He said he recalled one time when he stated that Caruthers had been trading with them and they owed him a setup; that Mrs. Watson went and got some cigars out of the box and gave them to Caruthers and another customer, and when she did this defendant said, "Don't you know it is agin the law to take cigars out of the box, always hand the box and let them take the cigars;" and that this was said in a joking way.

Complainant said that defendant on more than one time "accused me with having intimate relations with Mr. Clay." Asked to tell what defendant said, she stated that one time Clay was at the store to pay his grocery bill, gave her a check, and she handed him a pencil to sign it, whereupon he said it had already been signed and she took the check and gave him the change. After he left she said defendant asked her "why I was carrying on such a big conversation with Clay and I laughed about the check and he said that I had to guard myself and not allow myself to talk to customers, it made no difference what they said to me, and never to let myself get tickled." On another occasion she said that Clay came in when the radio was on loud and said something to her which she did not understand. He then walked close to her and was telling her. About this time defendant came into the store and Clay walked out behind him. After Clay had gone defendant said to complainant, "Now I want you to explain what capers you were cutting with Clay, and I said, why he just walked in and spoke to me, and he said, well, you had one affair with Clay and you know how it ended, and I said, what do you mean, how it ended, and he said, well, I saw Clay in the store and you looked at him and gave him the ha ha and stuck your mouth out and walked

across the floor like a queen. Mr. Clay must have a very fine opinion of you.'' Defendant denied that he had ever accused her of any improper relations with Clay. He said that he had always told her ''to be careful, to treat people like they treated us.''

Complainant related a conversation she had with defendant about a man by the name of McKinney. The substance of this was that Mc-Kinney came to ask her about a girl to stay with his wife; that after McKinney left defendant said, ''Well, I don't know what you all have been doing or what you have been talking about.'' Defendant says that he remembered one occasion when McKinney and his boys came to the store and while he was getting up the groceries for them McKinney walked back into the room where complainant was washing. After they left defendant said that complainant remarked that she didn't know why McKinney would come in and sit down where she was at work. Defendant told her that he supposed that McKinney wanted to ask about the girl. Complainant then stated she wished McKinney would not come and hinder her, whereupon defendant said if she kept on with her work he would not have hindered her. She stated this would have made McKinney mad, to which defendant replied that it would not have made any difference if he had got mad.

The last man with whom complainant charges that defendant said she had been guilty of illicit relations was Jesse Wallace, who was a feeble minded boy of about twenty-one years of age and who it seems had been reared by some of her family. She said that this boy was at the home of her and defendant one night when they had some cantaloupes and she ''insisted that Jesse eat cantaloupe. Well, John blew up about it, and the next morning he told Jesse to get his clothes up, that he was going to take him over to town, and Jesse said he didn't want to go home, and he told me again that if I wanted to go home, to get my clothes and he would take us to the train, that he wasn't going to have any of that kind of stuff around there.'' Defendant denied this and said he had never known of his wife being guilty of any improprieties and had never accused her of anything of the sort; that she was absolutely a woman of good character, and ''if she had thought as much of her home as I thought she did, she would have been there today.''

The above is an outline of the evidence heard by the chancellor. After seeing and hearing the witnesses he said: ''I have listened very carefully to all this testimony. These two people have just fallen out, for some reason I am unable to understand. . . . I think the burden of proof is on complainant to prove the allegations of her bill, and she has not done so, she is not entitled to the relief prayed for, hence the original bill will be dismissed.''

In this we think the learned chancellor did not err. It is true that false and malicious charges of adultery against a wife by her husband may amount to such cruel and inhuman treatment as to

render her cohabitation with him unsafe and improper, and may constitute such indignities to her person as to render her condition intolerable and justify her withdrawal. Code, sec. 8247; Lyle v. Lyle, 86 Tenn., 372, 6 S. W., 878; McClanahan v. McClanahan, 104 Tenn., 217, 56 S. W., 858; Parks v. Parks, 158 Tenn., 91, 11 S. W. (2d), 680. But the matters attributed by complainant to defendant, we think, hardly amount to such a charge, though she now undertakes to magnify and exaggerate them to such a charge. We think it is apparent from her testimony that these matters were not the cause of her leaving defendant, as she alleged in her bill; for she said she left him because she was "afraid to stay there with him by myself." Yet she admitted that he had never struck her or threatened her with any violence. Evidently the cause of her withdrawal was the difference that arose between the parties over the property or something other than the matters upon which she now seeks a divorce and alimony. While these matters, if true, would indicate jealousy, suspicion, rudeness, and ill-temper on the part of defendant, we do not think it appears that they actually caused her such suffering in mind or body as rendered her cohabitation with him unsafe and improper, or rendered her condition intolerable and forced her to withdraw from him. Mere acerbity of temper, occasional reproaches, rude language by the husband toward the wife, and even threats of violence where none is attempted, do not constitute ground for divorce under our statutes. Shell v. Shell, 34 Tenn. (2 Sneed), 716; see note, 73 Am. Dec. 626; 19 C. J., 43, 44; 17 Am. Jur., 179.

■ ■ After complainant's solicitor had put on his proof he stated: "I close in chief. I have some character witnesses that I will put on later. The Court: I don't think we need them. Let the record show." After defendant concluded his proof and after the chancellor indicated his views, complainant's solicitor stated he wished to call the character witnesses and an expert in handwriting to show the changes in the deed were in a different hand writing from the rest of the deed, to recall complainant to rebut "various statements made by defendant," and also to offer a certified copy of defendant's bill against his former wife for divorce. The chancellor declined to hear the character witnesses because it was conceded complainant had a good character, defendant himself having so testified, and declined to hear the other matters because they were immaterial. Error is assigned upon these several matters. If, as we think, the matters testified to by complainant were in themselves insufficient to support the charges in her bill, manifestly they could not be aided by these things which complainant's solicitor sought to introduce, and they were wholly immaterial, and the chancellor was not in error in declining to hear them. Error was also assigned because the chancellor declined to permit complainant's solicitor to argue the cause. While it is ordinarily reversible error for a court to refuse to permit a

litigant to be heard by his counsel, we do not think it was such in the present case. Burson v. Mahoney, 65 Tenn. (6 Baxt.), 304, 305. Manifestly argument could not have supplied the deficiencies in complainant's proof; and if there was any error in declining to hear her solicitor, we do not think it was prejudicial. Code, secs. 10653, 10654.

██ The remaining assignments of error are directed to the proposition that the chancellor, irrespective of whether complainant was entitled to a divorce, should have adjudged her property rights under the deed and to the money and stock of goods in defendant's possession. In both her original and supplemental bill she prayed for divorce and alimony, and the property rights asserted were incidental to this relief. The proof was likewise confined to the issue of whether she was entitled to divorce and alimony. It is true she claimed the land under the deed and claimed that the money and stock of goods belonged equally to herself and husband and was the result of their joint efforts; but we think the proof fails to sustain her claim as to the money and stock of goods and that she is hardly in a position to ask the active aid of a court of chancery to enforce her claim under the deed. This is so because she charged that the deed was made to her by her husband for the fraudulent purpose of defrauding his creditors; and while she denied in her bill that she had anything to do with procuring the execution of the deed, she admitted in her testimony that she knew of the fraudulent character and purpose of the deed when it was delivered to her. She said: "He (her husband) told me if he knew they would get judgment against him in this automobile accident, he would make the property over to me, he later brought me the deed, and said, have this deed registered, and also have them write a will for me." A court of equity will not lend its aid to enforce such a transaction. Owens v. Owens, 21 Tenn. App., 104, 106 S. W. (2d), 227, and authorities there cited.

For these reasons the decree of the chancellor is affirmed. Appellant and her sureties will pay the cost of the appeal.

Faw, P. J., and Crownover, J., concur.

A Petition for Rehearing and for Additional Findings of Facts.

FELTS, J. ██ On a former day of the term we affirmed the chancellor's decree, which dismissed appellant's bill for divorce and alimony. She has filed a petition for a rehearing and for additional findings of facts, setting out eleven grounds upon which a rehearing is asked, and requesting the court to find as facts matters set out in six numbered paragraphs. We have carefully considered all these matters, and think they present nothing new not already considered and determined in our former opinion. Manifestly we cannot take time to respond to each of these numerous insistences. The statute (Code, sec. 10620), contemplates that we shall find only the ultimate,

determinative facts, and not mere details of evidence. Melody v. Hamblin, 21 Tenn. App., 687, 704, 115 S. W. (2d), 237, 248.

The petition is denied at the cost of petitioner.

Crownover, J., concurs.

Faw, P. J., did not participate in consideration of petition.