LAWRENCE REITANO, Appellant, v. SHIRLEY ANN REITANO, Appellee.—372 S. W. (2d) 213.

Western Section at Jackson. July 31, 1963.

Certiorari Denied by Supreme Court December 5, 1963.

Marvin B. Gambill, Memphis, for appellant.

Braxton Gandy, Memphis, for appellee.

BEJACH, J. This cause involves an appeal by Lawrence Reitano, who was complainant in the lower court, from a decree of divorce and award of custody of two minor children, entered in the Circuit Court of Shelby County, in favor of Shirley Ann Reitano on her cross bill filed in that court. For convenience, the parties will be styled as in the lower court, complainant and defendant, the term complainant being used to include appellant's position as cross defendant as well as that of complainant, and the term defendant used to include appellee's position in the lower court as cross complainant as well as defendant.

The separation between the parties occurred April 9, 1962 when defendant with two minor children of the parties, little boys aged 2 years and 1 year, respectively, left the residence of complainant and returned to the home of her parents. Suit was filed by complainant April 17, 1962. In his original bill for divorce, complainant charges that defendant has been guilty of such cruel and inhuman treatment or conduct towards complainant as renders cohabitation unsafe and improper. By way of specification, the bill alleges that defendant has consistently refused to accept the responsibility of a wife and has refused and neglected to carry out even the normal

duties, such as cooking and preparing meals for complainant and their children, and refused consistently to care for the clothing of complainant and their two children, and that for the past year she has refused to cohabit with complainant. The bill alleges that defendant mistreated their two children, and sets out specifically that "Complainant will show that while they were in the home of complainant's mother, that the defendant in another one of her rages and abuse, actually struck and hit their oldest child, knocking him to the floor and breaking two front teeth of this oldest child, and this occurred on October 19, 1961." The bill also alleges, "Complainant will further show that defendant carried on intimate and associations with another man at the place of her employment at the Sanitary Bag & Burlap Co. on Front Street, and that this correspondent will be named at the hearing. Complainant will show that the defendant carried on openly with this man, even in public, and made derogatory remarks in front of complainant and his parents with regard to this man." This man was later identified as Mr. Seymour Gilman, President of Sanitary Bag & Burlap Company. This charge is also reiterated in complainant's answer to defendant's cross bill, in which she had alleged that complainant had made false and malicious accusations to defendant's mother with reference to her association with other men, as follows. "He also denies making false and malicious accusations to cross defendant's mother with reference to her association with other men but avers that she was carrying on illicit associations with her employer as alleged in the original bill."

On April 24, 1962, defendant filed her answer and cross bill. In her answer she denies the allegation of com-

plainant's bill. In her cross bill, defendant alleges that complainant was guilty of such cruel and inhuman treatment or conduct as renders cohabitation unsafe and improper for her to cohabit with complainant and be under his dominion and control, and that complainant has abandoned her or turned her out of doors and refused or neglected to provide for her. By way of specification, defendant charges that throughout the entire time of their marriage, complainant consistently treated her parents with a rude, callous and cold attitude, that he refused to attend church with defendant, that when she was pregnant with their second child, she became extremely ill and nearly had a miscarriage in February 1961, and that the complainant would often leave her alone for an entire day, although he was not working at the time, nor seeking work. She charges that complainant indicated a marked preference for their older child, Alan, and practically ignored the younger one, Stephen. She also charges that complainant made statements to her mother, accusing defendant of going out with other men.

On May 4, 1962, the court entered an order granting to defendant temporary custody of the two children, Alan and Stephen, with the right of complainant to have them on alternate weekends. Temporary alimony in the sum of $100.00 per month and temporary counsel fees in the sum of $75.00 were allowed.

At the hearing, in addition to his own testimony, complainant introduced that of his father, John Reitano, his mother, Mrs. Dottie Reitano, and that of Mrs. J. L. Ryan, a former employee of the Sanitary Bag & Burlap Company.

In addition to her own testimony, defendant introduced that of Mrs. Mary Tothaker, Mr. Seymour Gilman,

Mrs. Pam Howe, Mrs. Francis McDermott, Mary O'Quinn, Mr. Leonard C. Coffin, her sister, Carolyn Salter, and that of her mother and father, Mr. and Mrs. John Salter. On July 11, 1962, after a full hearing, the court entered a final decree which dismissed the original bill of complainant, and granted to defendant, as cross complainant, a decree of absolute divorce on grounds of both cruel and inhuman treatment and abandonment and failure to provide. Custody of the children and permanent alimony was allowed, as in the interlocutory order granting temporary custody, with an additional fee to defendant's counsel in the sum of $400.00. To this decree defendant excepted, prayed and has perfected his appeal to this court.

In this court, as appellant, complainant has filed four assignments of error. Three of these assignments of error complain because the trial judge decided the case in favor of defendant and cross complainant, instead of in favor of the complainant and cross defendant. The other, which is Assignment III, asserts that the trial judge abused his discretion in cross examination of the witnesses.

██ This cause is before us under the provisions of Section 27-303 T.C.A., for trial de novo, with a presumption that the decree of the lower court is correct unless the preponderance of the evidence is to the contrary. The issues before us are almost entirely issues of fact. After a careful reading of the record, which consists of three volumes containing a total of 389 pages, we can not say that the evidence preponderates against the trial judge's decree. On the contrary, it is our opinion that the clear preponderance of the evidence is in favor of the defendant and cross complainant.

Complainant's principal charge that defendant was guilty of improper association with her employer at the Sanitary Bag & Burlap Company was completely discredited by the proof. His principal witness on this point, a Mrs. J. L. Ryan, was not only contradicted by other witnesses, including the president and other officers and employees of the Sanitary Bag & Burlap Company, but it was also shown, which Mrs. Ryan had denied, that she had been discharged and that defendant had subsequently been placed in the position which she had formerly held. The fact that defendant stayed at the office of the Sanitary Bag & Burlap Company for about an hour after she was due to be off, was fully explained by the circumstance that her husband, the complainant, who was at that time employed in The Three Sisters Building at the corner of Main Street and Union Avenue, left work an hour later than she did, and that she waited at her place of employment to avoid the traffic congestion and parking problems when she drove to Main and Union to pick him up. The proof also showed that the president, Mr. Gilman, sometimes Mr. Coffin, and sometimes a Mr. Craig, other employees, and the only three who had keys to the plant, alternated in staying with defendant, so that the place could be locked after she left. Indeed, complainant in his own testimony, disclaimed any serious charge of sexual misconduct on the part of defendant. From his cross examination by counsel for defendant, we quote as follows:

"Q Mr. Reitano, you have charged in your bill, you wife had illicit associations with a man down where she was working, you signed the bill?

"A Yes, sir.

"Q You swore to it?

"A Yes, sir.

"Q Did you see her do those things?

"A No, sir.

"THE COURT: What was it you swore to that you saw her do?

"A I didn't swear I saw her do anything.

"THE COURT: What did you ask?

"MR. GANDY: I am asking him if he didn't swear his wife had illicit relations and associations.

"MR. GAMBILL: He answered, he swore to the bill.

"A Yes, sir.

"Q Did you ever see them?

"A No, sir.

"Q Who told you about these things?

"A Mrs. Ryan.

"Q When did she tell you?

"A About a week after Shirley left.

"Q Did she call you, or did you call her?

"A I called her.

"Q Did anyone else tell you about it?

"A No, sir.

"Q She was the only one.

"A Yes, sir.

"Q I believe you called Mr. Gilman, did you not?

"A Yes, sir, I did.

"Q You made certain threats toward him?

"A You might call it a threat, I asked him not to employ my wife, I called him a second time when she told me she was going to leave.

"THE COURT: Who was the man she told you she had relations with?

"A Mr. Gilman, her boss, I called him at home and they said he had got troubles and I said I've got my troubles at my house, my wife said she was going to leave and if she did, I threatened to implicate him.

"Q This was according to what Mrs. Ryan said?

"A. Yes, sir, I did.

"Q You were going to implicate him?

"A I was trying to hold my family together.

"Q How were you going to implicate him?

"A I wasn't trying to implicate him, I was trying to keep my family together.

"MR. GAMBILL: Objection, Mr. Gandy is arguing with the witness.

"THE COURT: This is cross examination, let's not get into an argument.

"MR. GANDY: I'm not arguing with this witness.

"THE COURT: Go ahead.

"Q That was before Mrs. Ryan talked to you when you talked to Mr. Gilman?

"A Yes, sir.

"Q You told him you were going to implicate him in this divorce?

"A Yes, sir.

"Q Those words were the words you used? What did you mean?

"A If I called you and you employed my wife—

"THE COURT: Just a minute, he asked you what did you mean by implicating the man?

"A I was trying to run a bluff to keep my family together, that's what I meant by implicating him.

"Q You made a threat towards him that was nothing to do with what he was doing?

"A If you want to call it that.

"Q What do you mean by implicating?

"A Running a bluff, I was trying to scare the man because if a man calls my wife everyday and she puts him and that job before me and my family and the two little boys, there is something wrong.

"Q You made threats with nothing behind them?

"A Yes, sir.

"Q Do you know what implicate means?

"A Yes, sir.

"Q Lawrence, that's all you know about your wife's alleged conduct with Mr. Gilman?

"A Yes, sir.

"Q What Mrs. Ryan told you?

"A That and she put them before me and the children.

"Q I am asking you, nobody else told you about those things?

"A No, sir.

"Q Did you know that Mrs. Ryan had been fired down there for inefficiency?

"A No, sir.

"Q Did you ever ask your wife if she had done those things?

"A She never asked me.

"Q I am asking you, if after Mrs. Ryan talked to you?

"A My wife wouldn't talk.

"Q Did you ask your wife if she had done those things?

"A No, sir.

"Q You never gave her the benefit to deny or explain it?

"A No, sir.

"Q What Mrs. Ryan told you?

"A I don't remember the main thing was that my wife came to work like she owned the place and like coming out of the office from behind the closed door and saying she was going to wrap that baldheaded Jew around her finger.

"Q What did she say about the intimate relationship? What did Mrs. Ryan say?

"A I haven't meant to say she had sexual relations with anyone.

"Q You don't say?

"A No, it was intimate relations.

"Q You said here in your answer to the cross bill, and you signed it, and I hand you a copy of the cross bill, is that your signature?

"A Yes, sir, it is.

"Q Did you swear to that before a Notary Public or Mr. Gambill?

"A Yes, sir.

"Q In this particular answer to the cross bill, you said he also denies making false malicious accusations to cross defendant's mother with reference to her association with other men, but avers that she has carried on illicit associations with her employer as alleged at their place of business?

"A Yes.

"Q Was Mama Reitano present?

"A Yes, sir.

"Q Was Papa Reitano present?

"A Yes, sir.

"Q What was that illicit association?

"A Yes, sir, in my opinion a lady shouldn't act like that.

"Q Is that what you told your lawyer that was illicit?

"A No, sir, I told him what happened.

"Q He put the word in there.

"MR. GAMBILL: Objection. He is testifying as to facts. Mr. Gandy keeps going into the definition of these words.

"THE COURT: He has a right to ask why the phrase is in the bill. The normal assumption lawyers draw is according to what the client tells us. If he gave you words to put on paper, he has a right to hear how it happened, I am going to let him ask. Note your exception.

"Q In your original bill, you said this, The complainant will show that complainant carried on openly with this man, even in public.

"A Yes, sir.

"Q What do you mean by that?

"A One instant was in front of my parents.

"Q They carried on openly in public?

"A Yes, sir.

"Q Tell another.

"A I beg your pardon.

"Q Tell another incident.

"A That's enough. That's all I have.

"Q That's all you have. All right the complainant will further show that the defendant carried on an

intimate association with another man at her place of business, the Sanitary Bag & Burlap Company in Memphis, Tennessee and that this correspondent will be named at the hearing, what do you mean by intimate association?

"A It was the same as the other.

"Q What is the other, and what had she done?

"A She carried on the same way in front of me and my family.

"Q How many times?

"A Just once.

"Q When you and she got in the car?

"A In the car and him calling everyday and my children would say there is Mr. Gilman.

"Q What do you mean by intimate? You didn't mean sexual?

"A No, sir, I didn't.

"Q But you put it in the bill?

"A No, sir I told Mr. Gambill the facts.

"Q Mr. Gambill put it in?

"A Yes, sir.

"Q Did you sign it?

"A Yes, sir.

"Q Did you read it.

"A Yes, sir.

"Q Did you swear to it?

"A Yes sir, I swore to it."

From the trial judge's opinion, we quote as follows:

"I have sat here for several days and listened to what I believe to be one of the most complete situations of abuse of a young girl I have ever heard in my life. If anyone was so naive as to sit in this courtroom and believe that the allegations contained in this original bill, to-wit, and I am reading from the original bill on page three thereof, quote, I want this in the finding of fact and in the opinion, too, complainant will further show that the defendant carried on intimate A-N-D associations with another man at the place of her employment at the Sanitary Bag and Burlap Company on Front Street, Memphis, Tennessee, and this correspondent will be named at the hearing, end of quote. In the answer of the cross defendant to the cross bill on page one thereof there is this allegation, quote, he also denies making false and malicious accusations to cross defendants Mother with reference to her associations with other men, but avers that she was carrying on illicit associations with her employer as alleged in the original bill, end of quote. Show some star marks to show the association might have gone on but the other part is irrelevant. It is adroitly, and I think naturally he should have done so, but it is adroitly argued by counsel, that is counsel for complainant, that the word intimate and that the words illicit have other meanings or other connotations than that which the Court has drawn from the whole body of proof and the fact that those words were used in the two quotes that I have just placed in the record in the finding of fact in this cause. I can't blame Mr.

Gambill for doing that. He is an advocate in this case and he should make the best presentation on behalf of his client in a situation of this kind he can make. As I started out to say, no one in this room, no one in the whole wide world, and he knows it, I know it, everyone in this room knows, is so naive as to not get the clear intent and meaning of all this language I have just quoted. In its ordinary usual sense, particularly when it's found in the pleadings in a divorce case, that it means without qualification that he is making either a factual and truthful, or a reckless charge of sexual intercourse and adultery against this woman, and there is no way of getting away from it. What was overlooked was the reading either from Webster's Dictionary or from what I have in my hand here at this moment which is Black's Law Dictionary of which the best definition of a correspondent is defined, I will read it to you, 'correspondent, a person summoned to answer a bill, petition, or libel, together with another respondent, now chiefly used to designate a person charged with adultery with the respondent in a suit for divorce for that cause and joined as defendant with such party,' citing cases. That together with the sparring way in which it was sought to be shown here this girl might have done something wrong with that man she worked for, taking such reckless license with a person's reputation, not only this girl's reputation but this man, I speak of Seymour Gilman, I think he should be vindicated in this record, too, there is no proof in this record of this girl's having had ever the slightest degree of intimate relationship or even anything that smacks of intimate relationship such

as would lead to sexual intercourse with this man, Seymour Gilman, or anyone else, and I so find as a fact. I don't want this girl's name to be abused any further or her two little children, and I don't want this man, Gilman, to be so abused. There has been too much reckless license and freedom naming both of these two people. I am thoroughly ashamed it ever happened, not that I had anything to do with it, but I am thoroughly ashamed that the facilities of this Court were taken for that purpose and used so recklessly.''

The trial judge saw the witnesses and heard them testify. It is apparent that he believed the witnesses for defendant, and cross complainant, and disbelieved those of the complainant and cross defendant. Even in the cold type before us, it is obvious that the witnesses for complainant were evasive and indefinite and far from frank, whereas those of the defendant were open, frank, and convincing.

■ Numerous cases in Tennessee have held that false charges of adultery constitute cruel and inhuman treatment as a ground for divorce. Among them are Sharp v. Sharp, 34 Tenn. 496; Lyle v. Lyle, 86 Tenn. 372, 6 S. W. 878; McClanahan v. McClanahan, 104 Tenn. 217, 56 S. W. 858; Parks v. Parks, 158 Tenn. 91, 11 S. W. (2d) 680; Watson v. Watson, 25 Tenn. App. 28, 149 S. W. (2d) 953. Such false charges were made, in the instant case, to defendant's mother, who testified as to same, and also in complainant's sworn pleadings. Even considering complainant's charges as being short of alleging adultery but as constituting cruel and inhuman treatment under Meeks v. Meeks, 27 Tenn. App. 279, 179 S. W. (2d) 189;

complainant's charges fall short of making a case against defendant.

The clear preponderance of the evidence is in favor of the holding of the lower court.

■ With reference to Assignment of Error No. III that the trial judge abused his discretion in cross examination of witnesses, it is apparent from a reading of the record that the learned trial judge did ask numerous questions of many of the witnesses. The amount of such personal interrogation by the trial judge is more than usually appears in records before us; but, we can not say that the judge abused his discretion in so interposing himself into the lawsuit. All of the questions asked by him were pertinent to the litigation, and the answers given were, no doubt, helpful to the judge in making his finding of facts.

As stated above, the trial judge granted defendant a divorce on both grounds alleged, viz., cruel and inhuman treatment and abandonment and failure to provide. We concur in his finding as to cruel and inhuman treatment; but the proof is clear that defendant left complainant on April 9, 1962. Obviously, she was the one who abandoned him, if any abandonment occurred. She did testify that she had not intended her separation as being a permanent one until after complainant had filed the suit for divorce a little more than a week later. Nevertheless, she was the one who left, and if there was an abandonment, she was the one who abandoned him, rather than he her. We therefore modify the holding of the lower court by granting the divorce in this court on one ground only, viz., that of cruel and inhuman treatment. The divorce granted on this one ground is, however, just as complete

and effectual as if it had been granted on both grounds. With that modification, the decree of the lower court will be affirmed.

■ All of appellant's assignments of error will be overruled, and the decree of the lower court granting an absolute divorce to defendant and cross complainant on the ground of cruel and inhuman treatment will be affirmed. It is apparent to us, however, that since this cause was and should have been retained in court for supervision of the award of custody of the children, and with reference to the payment of alimony and child support; such supervision can be better handled in the lower court. For that reason, although the decree of the lower court is affirmed, the cause will be remanded to the Circuit Court of Shelby County for supervision of the decrees of that court and this court, and for such future modification or change as circumstances may warrant.

The costs of this cause will be adjudged against the complainant, Lawrence Reitano, and his surety on the appeal bond.

Avery, (P. J., W. S.), and Carney, J., concur.